Next case is Restaurant Technologies v. Jersey Shore Chicken and Olmatic v. Restaurant Technologies 2009-11-76 Mr. Lancaster, we will hear from you when you are ready. May it please the Court, Counsel, I represent Restaurant Technologies, Inc. This report found that three claim limitations in two claims did not present any fact issues with respect to non-infringement, as to literal infringement or as to equivalence infringement. I hope to say two or three things about each of those three limitations if I have time. That's a total of six. Yes, unless I run into three. I'd like to start, if I could, with the piping network interconnecting term. Various stations are interconnected with piping network. The District Court found that because of the absence of physical connections and because it stated the supply site components of this oil distribution system are not connected in any way to the waste site components, there can't be either literal or infringement by the doctrine of equivalence. It does seem clear that the Olmatic system has piping. Olmatic hasn't argued vigorously, if at all, that it's not a network. The parties have focused on the term interconnecting. The District Court noted that interconnect, citing a dictionary, can be defined as to connect with one another, and we accept that definition. We note that the claim language doesn't say hard-plumbed connection or direct connection or physical connection. It simply says connection. One of the members of this panel has been on a court that did explicitly disagree with one conclusion of the District Court, the conclusion that connect is an either-or proposition, and for that reason the doctrine of equivalence does not apply. In the Ethicon case, the court held that when you're considering doctrine of equivalence for that term, the court is to consider whether there is a substantial connection. We think that the specification supplies some guidance as to what the term interconnected means. What it says at column four is this. The stations are interconnected by piping. I'm going to several times have some verbal ellipses here. The stations are interconnected by piping capable of carrying the required flow of oil between selected stations for the various purposes described below. Well, what do we look at? Figure one. Do you want to show us where the five items are interconnected by piping? If figure one is one embodiment, Your Honor, what is essential? In other words, that doesn't support the case or argument. It does support our case in one significant extent, Your Honor. Let me first say the way that it doesn't support our case. The way that it doesn't support our case is that there are all kinds of connections that are depicted there. But the way that it does support our case is that an essential part of connecting the supply line to the used oil line is the nozzle that is depicted down at the bottom leading to the fryer. Now, as Oilmatic has observed and as is the case, the fryer station is not a part of claim one. But nonetheless, the oil has to travel through that in this depiction of the patent in order to get from one side to the other. It's part of claim eight, isn't it? No, it's not a part of claim eight. It is a part of claim one. And it isn't sufficient to observe that fryer is not a listed element in claim eight because what we're talking about is pipe paths here, a defined term right at the beginning of the patent. And what the patent says about the piping, not once or twice, but four times from the bottom of column five to the top of column six, is that part of the pipe path that's being discussed is that very flow that we're talking about at the end of the nozzle to the fryer vat. We have first and second containers of filter unit and first and second couplings. Where, either in the spec or in figures, is all of that interconnected through piping? The interconnection is as described in the part of the specification that I just read in terms of describing how these cycles that are set out in the patent work. Seven number cycles and then an eighth additional cycle. They are also depicted in our brief. And so the kinds of interconnections that the patent says are important is the accomplishment of those cycles from one station to another. And it is apparent, in fact I don't think it's even contested, that the oilmatic system accomplishes all those cycles. We certainly concede that if what's required, if this embodiment is taken as a definition of the claim rather than just one embodiment, we concede that there are not hard-plumbed connections amongst every aspect of the oilmatic system. Well, we've often said that a claim isn't necessarily limited to its preferred embodiment. But more often than not, we've found that that's the only embodiment, that there's nothing else there. And you seem to be sort of dancing around whether all of these are interconnected by piping. How about Claim 1, the two means clauses? I'd like to make just a couple points about each aspect of Claim 1. Let me start with means for metering oil. The Court identified structure that it found accomplished the means for metering oil. In the initial Markman opinion described a manually or electronically operated trigger valve with a nozzle added in the summary judgment ruling that that valve be squeezable. We, as we've said in our brief, think that construction is a little bit narrow for a couple reasons. One is the specification speaks alternatively of a nozzle valve or squeezable nozzle valve on the one hand and a trigger valve on the other. Let me just mention, although a layperson naturally thinks of a trigger as like a trigger on a gun, there is no indication in the patent that that's what's being contemplated. In fact, the only evidence as to what a trigger valve is comes from the declaration of Joe Duke, the RTI expert who indicated without contradiction that what is meant by a trigger valve is a momentary valve or a valve that is engaged so that the oil flows only when it's being applied. So the purpose of that being that a worker doesn't turn it on and leave and go walk someplace else. We also think that the Court was overly narrow in identifying structure in that the pump in both the oilmatic system and the RTI system play a role in the means for metering the oil. Obviously, the oil doesn't move if there's not a pump. Part of switching the pump on or switching the pump off is part of what's involved in metering the oil, and it happens in the oilmatic system. There's a third element that plays a role, a check valve at the end of the wand. How about control means? The control means, Your Honor, the issue that the Court focused on was the level of automation required. What oilmatic has, it's clear, is electromechanical switches. Push a button to start a pump, and that determines kind of the direction of the oil. We got a little hung up, perhaps, on the word continuum, which is not a crucial term, but the concept of when you're looking at a structure and looking at equivalence to the structure of looking at a range of equivalence is certainly core to the issue of how you decide what an equivalent structure is. What's maybe a little bit unusual about this patent is that the inventor explicitly identified a range of automation that they thought satisfied the terms of the invention. The inventors communicated as forcefully as they could that the level of automation for this control means was not an essential part of the invention in any respect, and they make that point over and over again. Column 3, they say the valve controller may be either a manually or electronically operated controller. Column 6, they say selecting the pipe path can be accomplished either manually or electronically through a controller. Column 10, the various operation cycles and manually operated valves may be completely or partially automated using microprocessor-based controls. When you read the column, would you also read the particular line reference that you're referring to? Yes, I apologize, Your Honor. As to the first one I read, it was column 3, line 50. The second point, and again, I'm using some oral ellipses here. Column 6, line 46. The third one, column 10, also line 46. It would be a very odd way to write a patent to say the level of automation doesn't matter. Here's one extreme. Here's another extreme. And then to conclude that an obvious alternative in between an electromechanical switch was meant to be excluded. And we think that maybe the most compelling evidence of the interchangeability of these features was supplied by Oilmatic itself. This Court has emphasized it's not just whether structures are interchangeable. It's whether they are known to be interchangeable. But here, Oilmatic went one step further. In connection with an obviousness argument, an invalidity argument, it argued that not only that these sorts of structures were interchangeable and known, but that they were obvious. It said that a trigger valve, knobs, microprocessor, they were all known at the time that this patent was applied for. They were all conventional ways of operating control systems like this. It would be obvious to replace with one another. They don't use the word interchangeable. But that's exactly the point that they're communicating in very forceful terms. If I'm subject to any questions, I would be inclined to stop now and then come back for less than four minutes. We will save the rest of your time for rebuttal. Thank you. Mr. David. Thank you, Your Honors. To please the Court, I thought that I would attempt to emphasize why the district court was manifestly correct in concluding that no reasonable jurors could find equivalence or a literal with respect to those three limitations that Mr. Lancaster addressed. And then I would specifically respond to specific limitations. We sent down one of these dipstick assemblies. I think I saw it on the side over there, and I have the same one that Mr. Lancaster, of course, has seen it. He's very familiar with it. We've been familiar with it for the last few years. We have here on the dipstick, and this is what the district court focused on, we have the supply line. It's color-coded. It's white. It's clean oil. So the supply line ends here where you spray it into the fryer with the short nozzle, and then the pipe goes all the way back here. It's white. It comes out, and it goes basically to the supply tank of the fresh oil, and at the end is the coupling. So you've got the coupling and the supply tank. That's two of the five components that are in the clause of the control means for connecting the languages, control means for piping network interconnecting, said first and second containers, said filter unit, and the first and second couplings. So we have in this line, the fill line, we have the first coupling, the first container, and it ends here. We have the drain line. The operator can go over to the fryer, as Mr. Lancaster is here by the fryer. He can put this longer nozzle in, and he can push the switch to energize the pump, and that pump would be in the drain line, which starts here at the tip where my finger is, goes up through the dark tube, through the waste tank, and then the waste coupling where the tank can pick up the dirty oil. So in this line, which is the waste line, we have the other two of four, two of the five. So far we have four of the five components, and as is clear, and as the district court found, no way are these two connected, yet alone by piping, which is the language of the clause, piping network interconnecting those five elements. There's not any connection between the tip of the drain and the tip of the supply. Is that where the connection has to be? Well, there has to be a connection. It doesn't necessarily have to be. But four of the five components have to be a piping network connection. So why can't you take the exhaust pipe and the intake pipe as the interconnection? The exhaust pipe and the intake pipe. But they're not connected by piping. The pipe is in the back, though. No, this goes to the coupling on the outside of the building. This goes to the other coupling on the outside of the building. The two shall never meet. This is a brute force approach. It's not the sophisticated piping network that's up there in their patent. Our client really took a step back where he went back to the Charade system and having two parallel paths never connected. Never connected. There's at least a foot between the end and the clause, a piping network interconnecting the five components. And the spec is his own lexicographer here. So the spec says very clearly, the same column four that Mr. Lancaster was referring to, the term piping. That's column four, line 12. I should say 14. Column three, I should say. Line 13 or so. The spec says very clearly that the term piping, that's the word that appears in the claim, piping network interconnecting. Piping is used to generally define the network of pipelines carrying the cooking oil. So to have a piping connecting four of these components, it's got to be, by the definition and specification, piping has to be a network of pipelines that carry the oil. And there is no pipeline carrying the oil between these four components. It's just there's this parallel path that never shall meet. How about claim one? Claim one, let me start with the control means. And I think that the point that the Court focused on is very, very simple. The control means was defined as a means plus function clause. And one means plus function says very clearly by the statute and by the Penwald case and by all the Court's precedent that you compare the allegedly accusing device to the structures disclosed in the specification and equivalent. Now, there were only two structures disclosed in the specification for this control. There was a system of push-pull knobs for operating the valves, which was a slideable knob with a lever on the side, and that in turn operated the valve. And the other system disclosed in the specification was a partially automated computer processor software system, microprocessor control. It was undisputed that our system doesn't have any microprocessor control. There's no algorithms, there's no programs, there's no computer. There isn't any. So the Court obviously focused on what we did have and compared it to the one system that was relevant, which was a system of push-pulls. And she concluded, and I think manifestly so, that nobody sitting in that jury box could reasonably conclude that pushing and pulling on push knobs, which rotates a lever to operate a valve, is insubstantially the same as a little preposition switch and a push button turns on a pump. They're miles apart. No reasonable juror could find that. If they did, you'd take it away on J and OV. That's why summary judgment was appropriate here. That's the control means limitation. And as far as the other limitation, the means of metering, it's really quite simple as well. The judge realized that there were eight specs in the spec and the means plus functions. You'd look for the corresponding function, the corresponding structure that was linked to that function. And instead of the squeezable trigger valve with nozzle. And the actual language, I think it's very instructive, is in her claim construction. This is in A91. The structure necessary to supply oil to the fryer in measured or regulated amounts, and that is the metering, is a trigger valve having a nozzle which opens when the valve is squeezed. So if you think about squeezing a nozzle, like in a gas station where you put gas into your car, and that opens the nozzle so that oil can then flush out and go through that nozzle. Now she said, look, I'm going to analyze the oil monitoring system from two points of view. I'll look at it from the point of view of the pump and the circuit switch here, or I'll look at just the switch together, alone. And she said, in no way is completing a circuit to energize a positive displacement gear pump substantially the same as squeezing a trigger that opens a nozzle and lets fluid flow. She said, in the oil monitoring system, yeah, I'll concede for purposes of discussion, she said, that's squeezing. That could be said to be a trigger. But all you're doing is energizing, setting up an electrical circuit to turn on a positive displacement pump. You're not doing anything more than that. She said, pushing an electrical circuit to turn on a pump is basically miles apart from squeezing a trigger to open up a nozzle and allow oil to flow. All you're doing in our system is energizing this pump, causing the shaft to rotate and generating pressure. That's not the same thing as opening a valve by squeezing on a trigger and letting oil under pressure flow out. So she said, no reasonable drawer could conclude that completing an electrical circuit to turn on a pump is substantially the same in the means plus function analysis as a system where you squeeze a trigger and open a nozzle and let oil flow through. Now, we're talking about means clauses which obviously involve equivalence. Is the doctrine of equivalence separately involved here? I think so, Your Honor. I think what we're talking about in means plus function equivalence is insubstantial variation rather than talking about in terms of function, way, and result. I think the courts tend to do the same and sometimes look at it in that way. But she actually did function, way, and result anyway. She did sort of boot and suspend this with respect to saying they function differently. They function in a substantially different way. And there is a quote, in fact, that I would point to. But is the function and the result the same? It's just the way which is different? In which clause, Your Honor? Control means or the... Control means. The control means? Let's just think about it. The control means is for... Let's think about it that way. The control means is for selectively operating said filtering, waste, supply, and viral valve means. And so the control means there, no. It wouldn't be the same function because our control means to the extent that we have a push button. It may turn on the pump and it may turn... It's capable to turn the switch the other way of turning on the pump in the waste line. I don't think it can control... The end result wouldn't be to control the filter. No, you would still control the filter. Because the filter valve means over here. So in terms of end result, you can't do the result called for in this claim because our dipstick assembly might be here. The filter is located underneath the fryer, we'll say. And you won't be able to control the valves over there with this switch. In fact, one of the arguments raised in their brief was that she was inconsistent in construing the control means of this claim versus the control means of another limitation, limitation F of claim 8. And I wanted to make this one point that there's a big difference between the control means of claim 1 and the control means that are referred to in claim 8. The difference is as follows. Pump means in claim 8, limitation G. The limitation is pump means for circulating cooking oil along said selected path. Nothing about operating valves. Just pump means... I'm sorry. I'm looking for the control. I got it mixed up. You're talking about paragraph F? F. F is pipe path control means for determining a pipe path. Nothing about operating the valves. Contrast that to claim 1, limitation E. And that says control means for selectively operating the filter, waste, supply and fryer valve means and for selecting a pipe path. She properly held with respect to the limitation 8F that it was just valves that can select a pipe path but for operating the valves in limitation 1E, you've got to have either what are implicated or either those push-pull knobs or the microprocessor control. So there is an additional function that is implicit, explicit I should say, in claim 1E that requires the selective operating of the valves. So obviously you can't say she should have held up the valves in her claim construction because valves couldn't operate valves. You need the push-pull knobs or the microprocessor controller to operate the valves. Whereas the other claim just says selecting a pipe path so she was correct saying that the valves do in fact select the pipe path and there's no inconsistency in her claim construction. So that was one point I wanted to get to and I think the other main point I want to get to in my allowable time is in its control means. 112.6 actually informs the inquiry as to what the equivalent should be. It says that you focus on what's described in the specification. It should be construed as what's described in the specification and equivalents thereof. It doesn't say, you know, that you look, if you have two alternatives, you compare it to anything that may exist in between them, this opposite poles, that theory that they came up with. There is no case law, there is no statute that provides that the proper analysis under 112.6 is to compare the infringing device to a continuum of alternatives that may exist between the two disclosed structures. The statute is very clear. PenWalk is very clear. The allegedly infringing device gets compared to whatever structure is disclosed in the specification and the equivalent of that structure. And the case law, the linear case that she cited and indeed the Versa case that RCI cited, both stand for the proposition that you compare the allegedly infringing device to the disclosed, whatever is disclosed in the specification that corresponds and is linked to the claimed function. There is no support, there is no case law, there is no statute that says you compare an allegedly infringing device to anything on the continuum between the disclosed structures that are in the specification. That theory, I think, is just fabricated at all costs and is not supported by the law. That was the other major point that I wanted to make. Thank you, Mr. David. Mr. Lancaster has some rebuttals. I'd like to make one point, if I could, about the Claim 8 issue again, the piping network interconnecting. We think that the best evidence of what the parties think connected means is supplied by Oilmatic itself. Oilmatic stipulated that its own patent describes its system as installed, and what it said in its own patent, despite the arguments you've just heard, is that there is, quote, piping connecting, close quote, among other components, the fresh and used oil tanks. In other words, throughout the entire system, according to Oilmatic in its patent, and I'm quoting from, it's in the appendix at 281, 282, column 2, line 42. According to Oilmatic, its own system is connecting. It describes it in advertising materials as a closed-loop system. The connection, as it's illustrated in the cycles that we set out in our brief and that are set out in the patent, is through the fryer. And after the oil comes through the nozzle, and then it goes into the fryer and back out, and there is an air gap there, as depicted in the patent, that's exactly the same way it works in the Oilmatic system. If I could say just a word about Claim 1. The dipstick plays a role in both means plus function elements with respect to Claim 1. But it's apparent there is a nozzle that's got a nozzle. There is a trigger valve. Trigger valve, as I said, is defined as a momentary valve. Council argued that pushing that button is nothing like anything in the patent. That's exactly what's disclosed in the patent, a trigger valve. And finally, there's a valve, in fact, there's multiple valves. There's a check valve, and Oilmatic stipulates for purposes of this appeal that a pump is a valve. A pump regulates the flow of oil. Obviously, a pump can do things in addition to other kinds of valves. But what that does, you push the trigger valve, activate the pump, a valve. That's exactly what is described in the patent. And the only difference is the physical distance between the switch and the valve, if you ignore the check valve at the end. And the patent says nothing about the placement of those two features. Finally, there are equivalence issues for all three points. We have not argued the doctrine of equivalence for the means plus function terms. But obviously, when we're looking at the structure that satisfies the means, we're looking at the structure or equivalence to the structure. And obviously, for Claim 8, we're talking about the doctrine of equivalence when we're talking about a substantial connection. The most compelling single piece of evidence in the case, we think, apart from the parties' patents, is the declaration submitted by the RTI expert. And there's a couple of them, but the most substantial one is around the 859 and 860 range of the appendix. And that is a declaration that goes through the means plus function analysis, that goes through the equivalence analysis for each of these three issues, not in conclusory terms, but in very detailed terms. And this court has issued a number of decisions in which that kind of evidence was held to be improperly analyzed or improperly overlooked in granting summary judgment. In this case, of course, as we point out, it wasn't even mentioned by the district court. Thank you, Mr. Lancaster. We'll take the case under revision.